**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**HASSAAN QAZI,**

*Plaintiff,*

v.                                    **Civil Action No.** _____

**MARCO RUBIO,** in his official capacity as

Secretary of State;

**BRIAN HEATH,** in his official

capacity as Consul General at the U.S. Consulate
General in Frankfurt, Germany;

**PAMELA BONDI,** in her official capacity as

Attorney General of the United States;

**JOSEPH B. EDLOW,** in his official capacity as

Director, U.S. Citizenship and Immigration Services,

*Defendants.*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,**
**WRIT OF MANDAMUS, AND RELIEF UNDER THE**
**ADMINISTRATIVE PROCEDURE ACT**

**PRELIMINARY STATEMENT**

**1.** Plaintiff Hassaan Qazi ("Plaintiff") brings this action against Defendants to compel the adjudication of his H-1B nonimmigrant visa application, which has been pending in administrative processing under Section 221(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1201(g), for over two hundred days as of the date of this filing, without any decision, substantive communication, or indication of when a decision will be rendered.

**2.** Plaintiff does not ask this Court to direct the outcome of his visa application. He asks only that the Court compel Defendants to fulfill their non-discretionary duty to adjudicate the application within a reasonable time, as required by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 555(b), 702, 706, and the Mandamus Act, 28 U.S.C. § 1361.

**3.** As a result of Defendants' failure to act, Plaintiff has been stranded outside the United States for nearly seven months, unable to return to his employment, his home, or his life in New York. His employer has been compelled to place him on unpaid furlough. His planned engagement and marriage have been indefinitely delayed. He has been unable to appear for scheduled proceedings in a pending state court action. The delay is causing cascading, compounding, and in

some cases irreversible harm across every dimension of Plaintiff's professional, financial, personal, and legal life.

## JURISDICTION AND VENUE

**4.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction), 28 U.S.C. § 2201 (declaratory judgment jurisdiction), and 5 U.S.C. §§ 702, 706 (judicial review of agency action under the APA).

**5.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff's H-1B petition was filed by his employer, which is headquartered in and conducts its operations within this District. The employment relationship underlying the H-1B classification is centered in this District. The petition was approved by USCIS based on the employer's operations in this District.

**6.** Venue is further proper under 28 U.S.C. § 1391(e)(1)(A) because Defendants are officers of the United States sued in their official capacities. Moreover, Plaintiff, as a nonresident alien, does not "reside" in any judicial district for purposes of the venue statute. Where a plaintiff cannot establish residence in any district, venue is properly determined by reference to the district where a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391(e)(1)(B). The events giving rise to this claim—the filing and approval of the H-1B petition, the employment relationship, and the employer's operations—are centered in this District.

## PARTIES

**7.** Plaintiff Hassaan Qazi is a citizen of the Federal Republic of Germany. He holds a Bachelor's degree from New York University and has been employed as a Data Solutions Strategist at Friends of the High Line, Inc. in New York, New York, for approximately three years. He is the beneficiary of an approved H-1B nonimmigrant worker petition. He maintained his residence in New York, New York, until Defendants' failure to adjudicate his visa application rendered him unable to return to the United States. He has been outside the United States since approximately late August 2025, unable to return to his home, his employment, or the jurisdiction of this Court.

**8.** Defendant Marco Rubio is the Secretary of State of the United States. He is named in his official capacity as the head of the agency responsible for the adjudication of visa applications at United States embassies and consulates abroad. He is responsible for ensuring that consular officers adjudicate visa applications in a timely manner.

**9.** Defendant Pamela Bondi is the Attorney General of the United States. She is named in her official capacity because the Department of Justice, through the Federal Bureau of Investigation ("FBI"), conducts NAME checks and maintains the Terrorist Screening Database consulted during the interagency Security Advisory Opinion ("SAO") process. On information and belief, the FBI's background check and screening processes are a component of the administrative processing to which Plaintiff's visa application has been subjected.

**10.** Defendant Joseph B. Edlow is the Director of U.S. Citizenship and Immigration Services ("USCIS"). He is named in his official capacity because USCIS approved the underlying H-1B

petition and because USCIS participates in the interagency process relevant to Plaintiff's visa adjudication.

**11.** Defendant Brian Heath is the Consul General at the U.S. Consulate General in Frankfurt, Germany. He is named in his official capacity as the senior consular official at the post where Plaintiff's visa application was filed and where it remains pending in administrative processing. The Consulate General in Frankfurt is the largest U.S. consular post in the world and is responsible for the adjudication of Plaintiff's H-1B visa application. As Consul General, Defendant Heath exercises supervisory authority over the consular officers and administrative processing at the post.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Background and Immigration History

**12.** Plaintiff is a citizen of the Federal Republic of Germany. Germany is a member of the Visa Waiver Program ("VWP"), and Plaintiff has previously entered the United States under the VWP as well as under prior nonimmigrant visa classifications.

**13.** Plaintiff holds a Bachelor's degree in Sustainable Urban Environments from New York University. He has been employed at Friends of the High Line, Inc., a nationally recognized nonprofit organization located in New York, New York, since approximately May 8, 2023. In his current role as Data Solutions Strategist, he leads the organization's geospatial data infrastructure, manages data integration across multiple organizational systems, and develops analytical tools that support the organization's programmatic and operational decision-making.

**14.** Plaintiff has no criminal record of any kind. He has no history of civil immigration violations, visa overstays, or any other adverse immigration action. He has never been denied a visa, refused entry to the United States, or subjected to removal proceedings.

**15.** Plaintiff was born in Pakistan and held Pakistani citizenship from birth until 2007, when he renounced that citizenship upon naturalization as a citizen of the Federal Republic of Germany. German law at that time did not permit dual citizenship, and Plaintiff has held no citizenship other than German since 2007. He resided in Pakistan from approximately 2008 to 2017. These facts have been fully disclosed on every visa application and government filing Plaintiff has submitted, and were known to every agency that has screened Plaintiff throughout his immigration history. Plaintiff's field of study at the time of his initial entry to the United States—biomolecular science—and his subsequent field of study and employment in urban planning and geospatial data analysis have similarly been disclosed on all applications and are known to Defendants.

### B. Plaintiff's Extensive History of Successful U.S. Government Security Screening

**16.** Over the past nine years, Plaintiff has been subjected to and has successfully completed at least nine separate security screening processes conducted by five agencies of the United States government. Each screening cleared Plaintiff without adverse findings:

**(a) ESTA Approval (2016).** Plaintiff was approved under the Electronic System for Travel Authorization, administered by U.S. Customs and Border Protection ("CBP"). ESTA approval requires vetting against terrorist watchlists, law enforcement databases, and lost/stolen passport databases.

**(b) F-1 Student Visa Issuance (2017).** Plaintiff underwent a full consular interview, background check, and security screening at the U.S. Embassy in Islamabad, Pakistan—one of the highest-scrutiny consular posts in the world—and was issued an F-1 nonimmigrant student visa to pursue a degree in biomolecular science at New York University. The visa was issued with full knowledge of Plaintiff's country of birth, prior Pakistani citizenship, Pakistan residence, and intended field of study.

**(c) Global Entry Approval (2018).** Plaintiff was approved for CBP's Global Entry Trusted Traveler Program following an in-depth background check that included criminal history, customs violations, immigration violations, and a personal interview conducted by a CBP officer. Approval for Global Entry constitutes an affirmative determination by the United States government that the applicant is a low-risk individual.

**(d) SEVIS Major Change (2019).** After his sophomore year, Plaintiff changed his field of study from biomolecular science to Sustainable Urban Environments. This change was processed by Plaintiff's Designated School Official and reported to the Department of Homeland Security through the Student and Exchange Visitor Information System ("SEVIS"). DHS raised no objection and took no adverse action in connection with this change.

**(e) Employment Authorization Document — Post-Completion OPT (2022).** Following Plaintiff's completion of his degree at New York University, USCIS adjudicated and approved Plaintiff's application for an Employment Authorization Document (Form I-765) for post-completion Optional Practical Training. EAD adjudication requires an independent USCIS background check, including queries against law enforcement and national security databases. Plaintiff was cleared and the EAD was issued.

**(f) Employment Authorization Document — STEM OPT Extension (2023).** USCIS adjudicated and approved a second EAD application for Plaintiff under the 24-month STEM Optional Practical Training extension program. Plaintiff was again subjected to and cleared through USCIS's background check process.

**(g) F-1 Visa Renewal (2024).** In December 2023, Plaintiff, then on STEM Optional Practical Training following the completion of his degree in 2022, submitted a dropbox visa renewal application at the U.S. Consulate General in Frankfurt. The application was refused under Section 221(g) and Plaintiff was called in for an in-person consular interview. At that interview, in early 2024, the consular officer reviewed Plaintiff's application and approved the visa within minutes. This episode is significant: the government's own screening system flagged Plaintiff's profile, subjected it to additional scrutiny, and upon even minimal review, immediately cleared him. The contrast between that rapid resolution and the current delay of 210 days—involving the same applicant, the

same consular post, and an H-1B petition backed by an approved USCIS determination—underscores the unreasonableness of the present processing time.

**(h) Global Entry Renewal (2024).** Plaintiff's Global Entry membership was renewed following another round of CBP vetting. Plaintiff was again cleared.

**(i) FAA Part 107 Remote Pilot Certificate (2025).** The Transportation Security Administration ("TSA") conducted a security threat assessment of Plaintiff as part of his application for a Federal Aviation Administration Part 107 Remote Pilot Certificate. This assessment included checks against terrorist databases and criminal history records. Plaintiff was cleared and the certificate was issued.

**17. As of the date of this filing, Plaintiff's Global Entry membership remains active.** Global Entry is a continuous vetting program; CBP runs enrollees' biographic and biometric data against law enforcement and national security databases on an ongoing basis. On information and belief, the interagency databases utilized for Global Entry continuous vetting overlap substantially with those consulted during consular security advisory opinion processes. The continued active status of Plaintiff's Global Entry membership constitutes a present-tense determination by CBP that Plaintiff presents no unresolved security, law enforcement, or immigration concern.

**18.** Plaintiff does not contend that his background is free of factors that may warrant routine security screening. He was born in Pakistan, resided there for nine years, initially entered the United States to study a field with national security sensitivity, and applies for visas on a profile that Defendants are fully familiar with. The point is not that screening is unwarranted—it is that screening has already been conducted, repeatedly, by multiple agencies, with full access to every fact in Plaintiff's biographical history, and has produced consistent and favorable results every time. When the government's own system flagged Plaintiff in connection with his 2024 visa renewal, the matter was resolved within minutes of a consular interview. Five separate agencies of the United States government—CBP, the Department of State, USCIS, TSA, and DHS through SEVP—have vetted Plaintiff through at least nine independent screening processes over nine years, and CBP continues to certify Plaintiff as a trusted traveler in real time through its continuous vetting program. A delay of this magnitude, imposed on an applicant with this record, in the absence of any communication suggesting that a specific and unresolved concern exists, is unreasonable as a matter of law.

### C. The H-1B Petition and Consular Interview

**19.** On or about May 28, 2025, Plaintiff's employer, Friends of the High Line, Inc., filed a Petition for a Nonimmigrant Worker (Form I-129) with USCIS on Plaintiff's behalf, seeking H-1B classification for Plaintiff to serve as a Data Solutions Coordinator at the organization's offices in New York, New York.

**20.** On or about June 13, 2025, USCIS approved the H-1B petition. A true and correct copy of USCIS's I-797 approval notice is attached hereto as **Exhibit A**.

**21.** Between the filing and approval of the I-129 petition and the present, Plaintiff's job title was changed from "Data Solutions Coordinator" to "Data Solutions Strategist" in recognition of his

expanded responsibilities. Plaintiff's employer's counsel determined that this change in title did not constitute a material change in the terms and conditions of employment requiring an amended or new petition, as the essential job duties and worksite remained substantially the same.

**22.** The H-1B program is numerically limited by statute. *See* INA §214(g)(1)(A), 8 U.S.C. §1184(g)(1)(A). Each approved petition represents a finite allocation from the annual cap, reflecting a deliberate Congressional determination that the petitioning employer's need for the named worker has been validated through the statutory process. H-1B status is time-limited and tied to the fiscal year cycle; time lost to administrative delay cannot be recovered. Congress designed the H-1B program as a unified statutory scheme in which USCIS adjudicates the petition and the Department of State processes the corresponding visa. USCIS—the agency Congress charged with determining whether the statutory criteria are satisfied—completed its adjudication and approved Plaintiff's petition, consuming a finite cap slot from the annual allocation. That determination is final and unreversed. The State Department's role at this stage is not to relitigate the merits of the approved petition, but to verify the applicant's identity, confirm eligibility, and complete security screening. Yet the State Department's indefinite failure to complete this downstream step is having the practical effect of nullifying USCIS's completed upstream determination—not through any exercise of statutory authority, but through inaction. Each day of unresolved administrative processing diminishes the remaining value of the Congressional allocation embodied in Plaintiff's approved petition.

**23.** On or about September 2, 2025, Plaintiff appeared for a consular interview at the U.S. Consulate General in Frankfurt, Germany to apply for an H-1B visa based on the approved petition.

**24.** At the conclusion of the interview, the consular officer issued Plaintiff a notice under Section 221(g) of the INA, 8 U.S.C. § 1201(g), informing him that his application required additional administrative processing. Plaintiff was not informed of the nature, scope, or expected duration of this processing.

**25.** Plaintiff's passport was retained by the Consulate General at the time of the 221(g) notice. Passport retention is standard consular practice during administrative processing and reflects the expectation that processing will be completed within a timeframe that warrants holding the applicant's travel document. Plaintiff's passport remained in the Consulate General's possession for approximately five months. During this period, Plaintiff was unable to use his passport for international travel or official identification purposes. Plaintiff ultimately retrieved his passport in February 2026—not because processing was complete, but because the delay had become so prolonged that continued retention served no adjudicative purpose. The retention-and-return sequence is itself evidence that the delay has exceeded any timeline the Consulate's own procedures contemplated: the government held Plaintiff's passport as though a decision were imminent, accomplished nothing during the period of retention, and returned it without having made any progress toward adjudication. The visa application remains pending notwithstanding the return of the passport.

### D. The Unreasonable Delay

**26.** As of the date of this filing, two hundred and ten (210) days have elapsed since Plaintiff's visa application was placed in administrative processing. No decision has been rendered. No substantive communication regarding the status of the processing has been provided to Plaintiff.

**27.** The Department of State has indicated that most administrative processing is resolved within sixty days of the visa interview. Individual U.S. Embassy websites—including that of the U.S. Embassy in Ankara, Turkey—state that "most administrative processing is resolved within 6 months." The current delay of 210 days exceeds even the most generous of these benchmarks. Under the sixty-day standard, the delay exceeds the Department's own guidance by a factor of more than three.

**28.** Plaintiff has exhausted all available administrative remedies and informal channels for obtaining a resolution, including but not limited to:

> (a) Multiple written inquiries to the U.S. Consulate General in Frankfurt regarding the status of his application;

> (b) A congressional inquiry initiated through the office of Kirsten Gillibrand, submitted on or about December 1, 2025;

> (c) A congressional inquiry initiated through the office of Daniel Goldman, submitted on or about January 26, 2026;

**29.** None of these efforts has produced any substantive response, timeline for adjudication, or indication that Plaintiff's application is being actively processed toward a decision. In response to multiple inquiries—including congressional inquiries—the Consulate General has provided identical templated language stating that the case "is still refused under INA 221g for administrative processing," that the processing "can neither be expedited nor waived," that the Consulate is "unable to predict the amount of time this will require," and that Plaintiff will be contacted "as soon as the processing of your application is complete." This response has been sent, in substantially identical form, on multiple occasions over a period of months. Notably, the responses provided to the congressional offices of Senator Kirsten Gillibrand and Representative Daniel Goldman were substantively identical to the templated responses provided to Plaintiff directly—demonstrating that no escalation path available to an applicant, including intervention by members of the United States Congress, produces any differentiated engagement with the case. A true and correct copy of representative correspondence from the Consulate General, including responses to congressional inquiries, is attached hereto as **Exhibit B**.

**30.** The Consulate General's templated responses do not constitute meaningful communication regarding Plaintiff's case. They identify no specific process that is pending. They name no agency conducting the review. They provide no timeline, no estimate, and no benchmark against which progress might be measured. They offer no individualized assessment of Plaintiff's case status. They do not confirm that any affirmative step has been taken since the date of the consular interview. A form letter that says "we cannot tell you anything, and we cannot tell you when we will be able to tell you anything"—sent identically and repeatedly over seven months— is not the good-faith discharge of an adjudicatory obligation. It is the institutionalization of indefinite non-decision. At minimum, the identical and repeated nature of these responses suggests that no individualized case-level review is being conducted at the consular post, and

that the delay is attributable to interagency processes over which the Consulate exercises no oversight and provides no transparency.

**31.** No mechanism exists to request expedited processing of an application in Section 221(g) administrative processing; the Consulate General's own communications explicitly state that no such mechanism is available.

**32.** On information and belief, the administrative processing delay affecting Plaintiff's application is occurring in the context of widely documented increases in visa processing times and administrative backlogs across U.S. consular posts. To the extent that the delay reflects policy choices regarding resource allocation, staffing, or processing priorities—rather than any unresolved security concern specific to Plaintiff—those policy choices do not relieve Defendants of their statutory obligation to adjudicate individual applications within a reasonable time. The APA does not permit agencies to convert policy-driven resource constraints into indefinite individual limbo.

**33.** Plaintiff has been in administrative processing for 210 days with no indication of progress. No communication from the Consulate General has suggested that a decision is imminent. No request for additional documentation has been made. No interview has been scheduled. In the event that Defendants render a decision on Plaintiff's visa application in temporal proximity to the filing of this action, after seven months of complete inaction, the timing and circumstances of that decision will warrant scrutiny by this Court.

### E. The Severe and Compounding Prejudice to Plaintiff

**34.** The delay has caused, and continues to cause, severe and compounding harm to Plaintiff across multiple dimensions of his life:

> **Professional Harm.** Plaintiff has been unable to report to his place of employment in New York for nearly seven months. His employer, despite its desire to retain Plaintiff, has been compelled to place him on unpaid furlough effective March 2026 due to his continued inability to return to the United States. Plaintiff's professional standing, career trajectory, and institutional knowledge are being diminished with each passing day of absence.

> **Financial Harm.** As a direct result of the delay, Plaintiff has lost and continues to lose wages from his employment. Since being placed on unpaid furlough, Plaintiff has been without income and has been depleting personal savings to meet basic living expenses while stranded abroad. The H-1B visa has a finite validity period; every day of delay reduces the remaining duration of authorized employment, causing a permanent and irrecoverable diminution of the economic benefit Congress intended the H-1B program to provide. The financial consequences of the delay have also impaired Plaintiff's ability to vindicate his rights in this proceeding: Plaintiff has been unable to retain counsel due to the costs imposed by several months of lost wages, and is compelled to bring this action pro se—not by choice, but because Defendants' own inaction has rendered the cost of legal representation impracticable.

**Personal Harm.** Plaintiff and his partner have planned to become engaged and marry. Plaintiff intended to propose in the fall of 2025, but has been forced to delay the proposal repeatedly as his expected return date has been pushed back indefinitely. The couple's originally planned wedding date of April 2026 is no longer feasible; even an immediate visa approval would not provide sufficient time to plan and execute the wedding. Each additional month of delay further compresses the timeline for a major life event that requires Plaintiff's physical presence in the United States.

**Harm to Plaintiff's Ability to Vindicate His Legal Rights.** Plaintiff is a party to a pending action in the Civil Court in Kings County, New York, Case No. SC-001865-25/K, in which he seeks recovery of an unreturned security deposit from a former landlord. Due to his inability to return to the United States, Plaintiff was unable to appear for a scheduled hearing in that proceeding and was compelled to request a continuance. The rescheduled hearing date is also at risk due to the continued delay in adjudicating Plaintiff's visa application. The applicable statute of limitations expires in September 2027, and Plaintiff's legal position—including his claim for statutory interest—is being materially weakened with each continuance necessitated by Defendants' inaction.

**Harm to Access to This Court.** Plaintiff is unable to appear in person before this Court for proceedings in this very action because of the same government failure to act that gives rise to this complaint. The delay has thus created the extraordinary circumstance in which Plaintiff must seek judicial relief for governmental inaction through a court system he may be unable to physically access due to that very inaction.

**Restriction on Freedom of Movement.** As set forth in paragraph 25, the Consulate General retained Plaintiff's passport for approximately five months. Although Plaintiff was entitled to retrieve his passport upon request, the practical incentive structure of the 221(g) process strongly discourages withdrawal: an applicant who retrieves his passport during administrative processing reasonably fears that doing so could be interpreted as withdrawal from the adjudicatory process or could delay the application further. Plaintiff's decision to leave the passport in the government's possession reflected a reasonable expectation—encouraged by the government's own procedures—that adjudication was forthcoming. When Plaintiff ultimately retrieved the passport in February 2026, it was not because processing had concluded but because the delay had rendered continued retention futile.

**The Procedural Trap.** Plaintiff cannot return to the United States to prosecute this action, attend proceedings, or meet with counsel. He cannot obtain information about why his case is delayed. He cannot expedite the process through any administrative channel. He cannot determine whether anything is being done. The government has created a system in which the applicant bears the entirety of the cost and risk of delay, possesses none of the information, and has access to none of the mechanisms that could resolve it. That is not administration. It is abandonment.

35. These harms are not speculative. They are ongoing, documented, and worsening with each additional day of delay. They are compounding: the professional harm accelerates the financial harm; the financial harm disrupts the personal timeline; the inability to return to the United States cascades across all pending legal, personal, and professional obligations simultaneously.

## CAUSES OF ACTION

### COUNT I

**Unreasonable Delay Under the Administrative Procedure Act**

*(5 U.S.C. §§ 555(b), 702, 706(1))*

**36.** Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

**37.** Under 5 U.S.C. § 555(b), each agency of the United States government is required, "within a reasonable time, [to] proceed to conclude a matter presented to it."

**38.** Under 5 U.S.C. § 706(1), a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed."

**39.** Plaintiff presented his visa application to Defendants for adjudication. Defendants have a clear, non-discretionary duty to adjudicate that application within a reasonable time. Defendants have failed to do so.

**40.** The delay is unreasonable under the factors set forth in *Telecommunications Research & Action Center v. FCC* ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984):

> **(a) TRAC Factor 1:** While no statute mandates a specific timeline for administrative processing, the APA's requirement that agencies act "within a reasonable time" applies. The Department of State has indicated that most administrative processing is resolved within sixty days. Individual U.S. Embassy websites state that most cases are resolved within six months. Two hundred and ten days have elapsed—exceeding the sixty-day benchmark by a factor of more than three, and exceeding even the six-month outer bound cited by the Department's own consular posts. The unreasonableness of this delay is compounded by the fact that Plaintiff is a citizen of Germany, a Visa Waiver Program country, and has an extensive record of successful security screening by multiple U.S. agencies, as set forth in paragraphs 16 through 18 above. Moreover, Defendants have offered no rule of reason—no explanation, no timeline, no indication that the processing is progressing at all—despite multiple inquiries through formal and informal channels. That the interagency screening process may involve classified protocols does not relieve Defendants of the obligation to communicate even a general timeline or acknowledgment of progress.

> **(b) TRAC Factor 2:** The H-1B program was enacted by Congress to enable United States employers to fill positions requiring specialty occupations with qualified workers. The program is numerically capped by statute, reflecting Congress's deliberate balancing of employer needs against labor market considerations. INA §214(g)(1)(A). Each approved petition consumes a finite slot from that annual allocation. USCIS approved Plaintiff's petition, thereby determining that the statutory criteria were satisfied and the allocation was warranted. The State Department's indefinite failure to adjudicate the corresponding visa application effectively nullifies that allocation—not through any

statutory authority, but through administrative inaction. The H-1B validity period is running; Plaintiff's employer is unable to benefit from the approved petition; and the Congressional purpose underlying the cap allocation is being frustrated in its entirety. The inter-agency disconnect is further underscored by the fact that USCIS is currently conducting the FY2027 H-1B registration process—accepting and processing new cap registrations for the next fiscal year cycle—while the State Department has not yet completed processing of a visa application based on a petition USCIS approved in the prior cycle. The agency that performed its statutory function promptly has moved on; the agency that has not performed its function continues to hold Plaintiff's case in indefinite limbo.

**(c) TRAC Factor 3:** The nature and extent of the interests prejudiced by the delay are severe. As set forth in detail above, Plaintiff has been stranded outside the United States for nearly seven months; has been placed on unpaid furlough; is losing wages and employment benefits; faces disruption to his planned marriage; has been unable to appear in a pending state court action, weakening his legal position with each continuance; and is unable to physically access this Court due to Defendants' own inaction. These harms are concrete, documented, ongoing, and compounding.

**(d) TRAC Factor 4:** Ordering Defendants to adjudicate a single pending visa application will not meaningfully burden agency resources or impede the adjudication of other matters. Plaintiff seeks no priority or preferential treatment—only the same timely processing to which all applicants are entitled. To the extent Defendants contend that agency-wide processing times have increased, the APA standard is individual reasonableness, not comparative reasonableness. The question before the Court is not whether other applicants are also experiencing delays, but whether this delay, for this applicant, with this extensive record of prior clearance, is reasonable. It is not.

To the extent Defendants may cite cases involving multi-year Section 221(g) delays as evidence that Plaintiff's 210-day wait falls within the range of normal processing, such comparisons are inapposite. The reported cases of multi-year 221(g) delays overwhelmingly involve immigrant visa applications, which operate under a fundamentally different statutory mechanism. Immigrant visa petitions do not expire; they do not consume a finite, time-limited allocation from a statutory cap; and the applicants do not lose days of authorized employment with each day of delay. The H-1B program, by contrast, is a depreciating asset. It is numerically capped by statute, time-limited by regulation, and tied to the fiscal year cycle. Every day of administrative processing permanently destroys a portion of the authorized employment period that Congress allocated through the cap. Unlike an immigrant visa applicant, who receives the full benefit of the visa whenever it is ultimately issued, Plaintiff's H-1B authorization is eroding in real time—irrecoverably—while Defendants decline to act. The reasonableness of a 221(g) delay must be assessed in light of the specific statutory scheme, the specific interests at stake, and the specific applicant's history. A categorical assertion that "221(g) delays can take years" ignores the structural differences between visa categories and the individualized nature of the TRAC inquiry.

**(e) TRAC Factor 5:** The delay implicates substantial humanitarian interests. Plaintiff has been involuntarily separated from his established life, home, employment, and personal

relationships in the United States for an extended and indefinite period. For over five months of the delay, the Consulate General retained Plaintiff's passport under circumstances that, as set forth in paragraph 25, discouraged its withdrawal. His inability to return to the United States is not the product of any choice or action by Plaintiff, but solely the result of Defendants' failure to perform their adjudicatory duty.

**(f) TRAC Factor 6:** Plaintiff does not allege that Defendants have acted in bad faith toward him individually. However, the communications Plaintiff has received from the Consulate General do not constitute meaningful engagement with his case. As set forth in paragraphs 29 and 30, the Consulate has provided only identical templated language—on multiple occasions, over a period of months—stating that no timeline can be provided, that processing cannot be expedited, and that Plaintiff will be contacted when a decision has been made. This is not communication—it is the repetition of a template. The government's silence on any case-specific detail is not neutral; it is a choice that imposes all costs of the delay on the applicant while insulating Defendants from any accountability for the pace or quality of their review. Whatever the internal reasons for the delay, the total absence of substantive communication converts administrative processing from a temporary procedural hold into an indefinite, unaccountable, and functionally unreviewable suspension of Plaintiff's immigration status.

**41.** The unreasonableness of the delay is further underscored by Plaintiff's extensive history of successful security screening by multiple United States government agencies, as set forth in paragraphs 16(a) through 16(i) above, and by the continued active status of his Global Entry membership, which constitutes a present-tense affirmative determination by CBP that Plaintiff presents no unresolved security concern.

**42.** Plaintiff acknowledges that the interagency security screening process may involve classified protocols, and he does not seek disclosure of the substance, methodology, or findings of any such process. Plaintiff does not ask this Court to review the content of any security determination or to second-guess the judgment of intelligence or law enforcement agencies. What Plaintiff asks is far more modest: that Defendants be required to adjudicate his visa application within a reasonable time, as the APA requires of every agency of the United States government. The classification of the underlying process does not exempt that process from the APA's reasonableness requirement. The APA draws no distinction between classified and unclassified agency action for purposes of the duty to act within a reasonable time. 5 U.S.C. § 555(b). National security is a reason to conduct thorough screening. It is not a basis for indefinite administrative paralysis.

**43.** Plaintiff has no adequate remedy other than judicial relief. He has exhausted all available administrative channels, none of which has produced any resolution, timeline, or substantive response.

**COUNT II**

**Writ of Mandamus**

*(28 U.S.C. § 1361)*

**44.** Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

**45.** Under 28 U.S.C. § 1361, the district courts have original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States to perform a duty owed to the plaintiff.

**46.** Plaintiff has a clear right to the adjudication of his visa application. He filed his application, appeared for his consular interview, and submitted all requested documentation. He has fulfilled all obligations imposed upon him by statute, regulation, and the consulate.

**47.** Defendants have a clear, non-discretionary duty to adjudicate Plaintiff's visa application. While the ultimate decision to grant or deny the visa lies within the consular officer's discretion, the duty to make a decision—rather than leave the application in indefinite limbo—is mandatory. *See Al-Gharawy v. U.S. Dep't of Homeland Sec.*, No. 21-1521, 2022 WL 2905781 (D.D.C. 2022) ("[C]onsular officers do not have discretion to delay indefinitely a decision on a visa application."); *Nine Iraqi Allies Under the Interpreter Translator Vis Program v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016).

**48.** No adequate alternative remedy exists. Plaintiff has attempted resolution through direct inquiry to the consulate as well as through multiple congressional inquiries, all without success.

**49.** The doctrine of consular nonreviewability does not bar this action. Plaintiff does not seek review of a final visa decision; no final decision has been rendered. Plaintiff's application remains in administrative processing under Section 221(g), which is by definition a temporary procedural hold, not a final adjudication.

**50.** The doctrine of consular nonreviewability presupposes a completed exercise of consular discretion. Where a consular officer has examined an application and rendered a determination—whether favorable or adverse—courts have historically declined to review the reasoning underlying that determination. But consular nonreviewability is a shield for decisions, not a license for non-decisions. The doctrine does not authorize consular officers to decline indefinitely to exercise the very discretion the doctrine is designed to protect. To hold otherwise would convert Section 221(g) from a temporary processing tool into an unreviewable mechanism for indefinite visa suspension—a power Congress has not conferred and that no court has recognized. *See Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997); *Al-Gharawy*, 2022 WL 2905781; *Nine Iraqi Allies*, 168 F. Supp. 3d 268; *Giliana v. Blinken*, 596 F. Supp. 3d 13 (D.D.C. 2022) (holding that "when an application is still undergoing administrative processing, even where a refusal has been relayed, the decision is not final" and delay claims are not barred by consular nonreviewability).

**51.** Even assuming *arguendo* that consular nonreviewability applies to the pace of administrative processing—a proposition Plaintiff disputes—the doctrine requires that the government's action rest on a facially legitimate and bona fide basis. *See Kleindienst v. Mandel*, 408 U.S. 753 (1972). At the outset of administrative processing, the stated basis—the need for additional security review—may have been facially legitimate. But facial legitimacy is not a permanent condition that attaches at the moment of initial refusal and persists in perpetuity regardless of subsequent circumstances. A justification that has been asserted for over 210 days, with no indication of progress, no communication of substance, and no explanation for why an applicant with nine prior security clearances requires an extraordinary duration of review, has lost whatever facial legitimacy it may once have possessed. The passage of time, combined with the government's

refusal to offer any particularized basis for the continued delay, permits an inference that the stated reason is no longer the actual reason—or that no active review is being conducted at all.

52. The Mandamus Act provides this Court with original jurisdiction to compel officers of the United States to perform duties owed to a plaintiff. 28 U.S.C. § 1361. This jurisdictional grant is not subject to an implied exception for consular officers, and no court has held that consular nonreviewability divests a federal court of mandamus jurisdiction over the failure to act. The doctrine prevents courts from dictating the outcome of consular adjudication. It does not prevent courts from requiring that adjudication occur.

53. The classification of interagency screening processes and the doctrine of consular nonreviewability, if applied simultaneously and without limitation, would produce the result that no court, at any point, for any duration of delay, could inquire into whether an applicant's visa application is being actively adjudicated. An applicant in administrative processing would have no recourse—not through the consulate, which offers only templated non-responses; not through Congress, whose inquiries produce identical templated non-responses; and not through the judiciary, which would be barred from reviewing either the substance or the pace of the process. This Court should decline to adopt a construction of the law that renders a category of government action permanently and completely immune from every form of oversight—administrative, legislative, and judicial—while imposing severe, compounding, and potentially irreversible harm on the individuals subject to that action. That is not the rule of law. It is its absence.

54. Should Defendants render a decision on Plaintiff's visa application after the filing of this action, Plaintiff respectfully submits that such action would not moot this controversy. Under the voluntary cessation doctrine, a defendant's post-filing compliance with a legal obligation does not moot a challenge to that defendant's prior non-compliance where the challenged conduct is capable of repetition. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 189 (2000). The government's pattern of non-responsiveness—seven months of inaction followed by a decision only after judicial intervention—is precisely the type of conduct the voluntary cessation doctrine is designed to address. Moreover, if Defendants render an adverse decision, the reasonableness of the adjudicatory timeline and the adequacy of the process that produced the decision remain justiciable questions under the APA.

## COUNT III

### Declaratory Judgment That the Section 221(g) Hold Has Exceeded Its Lawful Scope
*(28 U.S.C. § 2201)*

55. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

56. Under 28 U.S.C. § 2201, this Court may "declare the rights and other legal relations of any interested party seeking such declaration" in a case of actual controversy within its jurisdiction.

57. Section 221(g) of the INA, 8 U.S.C. § 1201(g), authorizes consular officers to refuse a visa application pending completion of administrative processing. By its terms, and by the Department of State's own published guidance—which indicates that most administrative processing is resolved within sixty days, and that even complex cases are typically resolved

within six months—this authority contemplates a temporary procedural hold of limited duration. The statute does not authorize an indefinite suspension of adjudication.

58. As applied to Plaintiff's case, the Section 221(g) hold has persisted for 210 days—exceeding the Department's sixty-day guidance by a factor of more than three, and exceeding even the six-month outer bound cited by the Department's own consular posts. No decision has been rendered. No substantive information has been communicated. No indication of progress has been provided. The hold has long since ceased to function as the temporary procedural mechanism Congress intended and has instead become an indefinite suspension of adjudication—an outcome the statute does not authorize.

59. Plaintiff is entitled to a declaration from this Court that the continued application of the Section 221(g) hold to his visa application, at the current duration and in the absence of any indication that active processing is ongoing, exceeds the lawful scope of that provision and constitutes agency action unlawfully withheld within the meaning of 5 U.S.C. § 706(1). Plaintiff does not ask this Court to direct the outcome of the visa application; he asks only that the Court declare that the statute does not authorize the government to hold an application in administrative limbo indefinitely, without accountability and without review.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that Defendants' failure to adjudicate Plaintiff's H-1B visa application constitutes agency action unlawfully withheld or unreasonably delayed in violation of the Administrative Procedure Act, 5 U.S.C. §§ 555(b) and 706(1);

2. Declare that the continued application of the Section 221(g) hold to Plaintiff's visa application, at the current duration and in the absence of any indication that active processing is ongoing, exceeds the lawful scope of Section 221(g) of the INA, 8 U.S.C. § 1201(g);

3. Issue a writ of mandamus, or in the alternative an order under the APA, compelling Defendants to adjudicate Plaintiff's visa application and render a final decision within thirty (30) days of this Court's order, or within such other reasonable period as the Court deems appropriate, provided that Defendants shall be required to file with the Court a written explanation for any request that adjudication require more than thirty days;

4. Order Defendants to show cause, within fourteen (14) days of the date of filing, why Plaintiff's visa application has not been adjudicated, by filing a status report—which may be filed under seal or submitted for *in camera* review to the extent Defendants contend that public disclosure would compromise national security—setting forth: (a) whether any specific interagency process remains pending with respect to Plaintiff's application; (b) the date on which such process was initiated; (c) whether the delay is attributable to any action or inaction by Plaintiff; and (d) the anticipated timeline for completion;

5. Order Defendants not to take any adverse action against the validity of Plaintiff's approved H-1B petition or any associated employment authorization during the pendency of this action;

6. In the event that Defendants render a final decision on Plaintiff's visa application during the pendency of this action, order Defendants to file with this Court, within seven (7) days of such decision, a written statement setting forth: (a) the specific statutory or regulatory basis for the decision; (b) the date on which the information or determination underlying the decision became available to Defendants; and (c) the reason such decision was not rendered earlier, including an explanation of what, if anything, changed between the filing of this action and the rendering of the decision;

7. Retain jurisdiction over this matter until Defendants have fully complied with any order issued herein;

8. Award Plaintiff his reasonable costs incurred in bringing this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

9. Grant such other and further relief as this Court deems just and proper.


Dated: March 31, 2026

Respectfully submitted,

**HASSAAN QAZI**

## VERIFICATION

I, Hassaan Qazi, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the above-captioned action, that I have read the foregoing Complaint and know the contents thereof, and that the factual statements contained therein are true and correct to the best of my knowledge, information, and belief.


Executed on March 31, 2026

Hassaan Qazi