UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

HASSAAN QAZI,

                         Plaintiff,

        -v-

MARCO RUBIO, *in his official capacity as
Secretary of State*, et al.,

                    Defendants.

-------------------------------------------------------------------X

26-CV-02668 (JAV)

<u>OPINION AND ORDER</u>

JEANNETTE A. VARGAS, United States District Judge:

On March 31, 2026, Plaintiff Hassaan Qazi ("Plaintiff" or "Qazi"), proceeding *pro se*, filed a complaint to compel Defendants to adjudicate his H-1B visa application. ECF No. 1 ("Complaint" or "Compl."), ¶ 1. The Court concludes that Qazi has established that he is entitled to relief under Section 706 of the Administrative Procedure Act ("APA").

## BACKGROUND

### A.    Statutory and Regulatory Framework

The Immigration and Nationality Act ("INA") regulates the admission of noncitizens into the United States. Under the INA, a noncitizen seeking to enter the country must generally obtain a visa, which is a travel document issued by a U.S. consular officer. *See* 8 U.S.C. § 1201(a); *see also Sunny v. Biden*, 573 F. Supp. 3d 759, 764 (E.D.N.Y. 2021) ("Broadly speaking, a foreign national wishing to enter the United States must first obtain a visa from the State Department." (citation

omitted)).  A visa does not itself authorize entry into the United States; rather, it permits the holder to travel to a port of entry and request permission to enter the United States.  *See* 8 U.S.C. § 1201(h); *see also Trump v. Hawaii*, 585 U.S. 667, 694-97 (2018) (explaining the "basic distinction" between visa issuance and entry "that runs throughout the INA"); *Gomez v. Trump*, 485 F. Supp. 3d 145, 158 (D.D.C. 2020) (same), *amended on other grounds by* 486 F. Supp. 3d 445 (D.D.C. 2020).

Visas are generally divided into two categories:  (1) immigrant visas and (2) nonimmigrant visas.  *See* 8 U.S.C. § 1101(a)(15); *see also Gomez*, 485 F. Supp. 3d at 158.  "Nonimmigrant visas are issued to foreign nationals seeking to enter the United States on a temporary basis for tourism, business, medical treatment, and certain types of temporary work."  *Gomez*, 485 F. Supp. 3d at 158.  "Immigrant visas are issued to foreign nationals intending to relocate permanently to the United States."  *Id.*

The nonimmigrant visa at issue here is an H-1B specialty occupation visa.

> The H-1B category enables U.S. employers to hire qualified foreign professionals in 'specialty occupation[s]' requiring 'theoretical and practical application of a body of highly specialized knowledge' and a 'bachelor's or higher degree.'  [8 U.S.C.] §§ 1184(i)(1), 1101(a)(15)(H)(i)(b).  An employer seeking to hire an H-1B worker must first file a labor condition application with the Department of Labor, identifying the specialty occupation position, the location of employment, and attesting that the employer will pay the worker prevailing wage rates.  *See id.* § 1182(n)(1)(A)-(D); 20 C.F.R. §§ 655.730(c)(4), 655.731(a).  After the application is approved, the employer may file a petition with [U.S. Citizenship and Immigration Services ("USCIS")] to classify the foreign worker as an H-1B nonimmigrant. *See* 8 U.S.C. § 1184(c)(1); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1).

> Once USCIS approves the petition, the worker may apply for an H-1B visa at a U.S. embassy or consulate, which will grant the visa, provided the application is complete and the worker is not otherwise ineligible to receive a visa.  9 FAM 402.10; 8 U.S.C. §§ 1182, 1201(g).

*Id.* at 159.  Furthermore, an approved H-1B specialty occupation petition ordinarily limits the initial duration of a noncitizen's H-1B status to a maximum of three years, *see* 8 C.F.R. § 214.2(h)(9)(iii)(A)(1), but the period of authorized admission under H-1B status is generally capped at six years, *see id.* § 214.2(h)(15)(ii)(B).

Ultimately, individuals attain H-1B status in one of two ways after USCIS approves their H-1B petition.  If the noncitizen resides outside the United States, then they attain H-1B status after they apply for and receive an H-1B visa and are lawfully admitted into the country pursuant to that classification.  *See* 8 U.S.C. § 1184(b) ("Every alien . . . shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title.");  *Chamber of Com. of United States v. DHS*, 815 F. Supp. 3d 73, 82 (D.D.C. 2025) (citing 8 U.S.C. §§ 1184(c)(1), 1201(a)(1)).  If the noncitizen already resides in the United States under a different status, then the change in status typically takes effect automatically upon the petition's approved H-1B start date.  *See Chamber of Com. of United States*, 815 F. Supp. 3d at 82 (citing 8 C.F.R. § 248.3(f)).

## B.    Factual Background

The following facts, which Defendants do not contest, *see* ECF No. 25-4

3

("Conf. Tr.") at 9:22–10:1, are primarily drawn from the Complaint.  Qazi has declared under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained in the Complaint are true and correct.  Compl. at 16.

Qazi is a citizen of the Federal Republic of Germany who entered the United States through an F-1 nonimmigrant student visa to study at New York University ("NYU") in 2017.  *Id.*, ¶¶ 7, 16(b).  After graduating from NYU with a bachelor's degree in Sustainable Urban Environments in 2022, USCIS approved his application for an Employment Authorization Document ("EAD") for post-completion Optional Practical Training ("OPT").  *Id.*, ¶ 16(d)-(e).  USCIS also approved Qazi's application for another EAD under the 24-month Science, Technology, Engineering, and Mathematics ("STEM") OPT extension program.  *Id.*, ¶ 16(f).  These programs extended the period during which Qazi could lawfully remain in the United States in F-1 status.  *See* 8 C.F.R. § 214.2(f)(10).

Qazi has been employed as a Data Solutions Strategist at Friends of the High Line, Inc. ("FHL"), a nonprofit organization in New York, New York, since approximately May 8, 2023.  Compl., ¶ 13.  In that role, he leads the organization's geospatial data infrastructure, manages data integration across multiple systems, and develops analytical tools supporting the organization's decision-making.  *Id.*

On May 28, 2025, FHL filed an application with USCIS seeking H-1B classification for Qazi so that he could continue to work for FHL in New York.  *Id.*, ¶ 19.  On June 13, 2025, USCIS approved the H-1B petition.  *Id.*, ¶ 20; ECF No. 1-1

4

at 2-3.  Had Qazi remained in the United States, his status would have automatically changed from F-1 to H-1B on October 1, 2025.  *See* ECF No. 1-1 at 2.

Instead, Qazi submitted a Form DS-160 on July 20, 2025, to apply for an H-1B visa abroad.  ECF No. 21 ("Peterson Decl."), ¶ 4.  He then traveled to Germany, where he appeared for a visa interview at the U.S. Consulate General in Frankfurt (the "Consulate") on September 2, 2025.  Compl., ¶ 23.  Although Qazi had previously completed nine separate security screening processes conducted by the United States Government over the past nine years—including one by the Consulate in 2024 to renew his F-1 visa, *id.*, ¶ 16(g)—the consular officer refused Qazi's application under Section 221(g) of the INA, 8 U.S.C. § 1201(g), citing the need for additional administrative processing, *id.*, ¶ 24; Peterson Decl., ¶ 5.  As part of this processing, the Consulate initially retained his passport but returned it to him in February 2026.  Compl., ¶ 25.

On September 23, 2025, the Consulate emailed Qazi a request for additional documents.  ECF No. 25-2.  The next day, Qazi responded with documents relevant to the requirements for an H-1B visa.  ECF No. 25-3.

Qazi has since reached out to the Consulate on three different occasions to inquire about his application.  *See* ECF No. 1-1 at 5-7.  On each occasion, the Consulate responded, in relevant part:

> Our records indicate that this case is still refused under INA 221g for administrative processing, a normal part of the visa application process that can neither be expedited nor waived. . . .  Once the administrative processing is complete, our office will contact you.  We understand there is frustration at the delay; however, a decision on

> this case cannot be made until we finish our review.  Visa applications are adjudicated in accordance with the provisions of the Immigration and Nationality Act (INA) . . . .  We cannot predict when the adjudication of this application will be completed.  As soon as the processing of your application is complete and the outcome of your case is known, you will be contacted . . . .

ECF No. 1-1 at 5-7.  To date, Qazi's H-1B visa application remains pending administrative processing.  Compl., ¶ 26.

## C.     Procedural History

On March 31, 2026, Qazi initiated this action *pro se*, seeking to compel adjudication of his H-1B visa application.  He asserts a cause of action for unreasonable delay under Sections 555(b), 702, and 706(1) of the APA.  Compl., ¶¶ 36-43.  Qazi also seeks a writ of mandamus under 28 U.S.C. § 1361, *id.*, ¶¶ 44-54, and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, *id.*, ¶¶ 55-59.

Qazi filed two letter motions seeking expedited consideration.  *See* ECF Nos. 11, 18.  The Court held a conference on May 7, 2026.  ECF No. 19.  At that conference, the Court stated that it construed Qazi's *pro se* Complaint and motions to expedite as raising a request for emergency injunctive relief pursuant to Rule 65.  Conf. Tr. at 8:6-13.  The parties confirmed that no evidentiary hearing was necessary with respect to that emergency application.  *Id.* at 9:18–10:7.  The Court ordered the Government to file its opposition to the motion for emergency relief by May 13, 2026.  *Id.* at 8:14-21.

On May 13, 2026, rather than filing their opposition to Plaintiff's Rule 65 motion, Defendants filed a motion to dismiss.  ECF No. 20.  Defendants argue that this action must be dismissed as to the USCIS Director and the Acting U.S. Attorney General because the Complaint lacks allegations of their involvement; that the Complaint fails to state a claim under the APA and the Mandamus Act; and that the doctrine of consular nonreviewability requires dismissal of Qazi's claims.  ECF No. 22 ("Mem.") at 8-22.

On May 23, 2026, the Court informed the parties that it construed the Defendants' motion to dismiss as its opposition to the application for a preliminary injunction pursuant to Rule 65.  ECF No. 31.  The Court additionally notified the parties that it intended to consolidate its consideration of the requested emergency relief with a resolution of the merits of Plaintiff's claims, as there were no disputed issues of fact and resolution of this matter turned exclusively on questions of law.  ECF No. 31.  Accordingly, the Court ordered the parties to submit objections regarding the intended consolidation no later than May 27, 2026.  *Id.*  Neither party objected.  *See* ECF Nos. 32, 33.

## DISCUSSION

Since Qazi does not oppose Defendants' motion to dismiss to the extent it seeks dismissal of the USCIS Director and the Acting U.S. Attorney General from the action, ECF No. 25 ("Opp'n") at 8, the Court grants Defendants' motion to dismiss in this respect.  As a result, there are three remaining issues requiring resolution: (1) whether the doctrine of consular nonreviewability bars judicial

review of a consular officer's delay in adjudicating a visa application; (2) whether the Consulate has adjudicated Qazi's H-1B visa application and, if not, whether the Consulate's delay in adjudicating Qazi's H-1B visa application is unreasonable; and (3) whether Qazi is entitled to a writ of mandamus. The Court addresses each issue in turn.

## A.    The Doctrine of Consular Nonreviewability

The Supreme Court has described the doctrine of consular nonreviewability as the "rule" that "federal courts cannot review" "a consular officer's denial of a visa." *Dep't of State v. Munoz*, 602 U.S. 899, 908 (2024). Consistent with this general principle, the Second Circuit has previously ruled that courts may not "review . . . the action of [consular officers] suspending or denying the issuance of immigration visas." *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978). As the Second Circuit has recently recognized, however, whether this doctrine delineates the limits of the federal courts' subject matter jurisdiction or is grounded in prudential considerations that "counsel[] against exercising normally available jurisdiction" is still unsettled. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009) (holding that doctrine did not prevent First Amendment challenge to consular official's determination of statutory ineligibility).

The scope of the doctrine of consular nonreviewability is similarly murky. In *Ahmed v. Bitter*, a district court in the Eastern District of New York court outlined two primary approaches to the doctrine. No. 23-CV-00189 (NGG) (RJL), 2024 WL 22763 (E.D.N.Y. Jan. 2, 2024). On the one hand, "[a] majority of courts in this

8

Circuit have extended this doctrine to bar . . . judicial review [not only] of consular decisions and actions, but [also of] *any* part of the visa application process, including cases seeking to compel action on an application within a reasonable period of time." *Id.* at *5 (citing *Abdo v. Tillerson*, No. 17-CV-7519 (PGG), 2019 WL 464819, at *3 (S.D.N.Y. Feb. 15, 2019) (collecting cases)).  On the other hand, other Circuits, and "[a] minority of district courts in this Circuit," have "distinguished actions alleging unreasonable delay in the visa application process from those challenging immigration officials' decisions to grant or deny a visa." *Id.* at *5-6 (collecting cases); *accord Waris v. Bitter*, No. 23-CV-9487 (JGLC), 2024 WL 3237914, at *3 (S.D.N.Y. June 28, 2024) (collecting cases).  According to this second approach, which the *Ahmed* court adopts, because "the consular nonreviewability doctrine does not apply to claims focused on the lack of a decision by consular officials," judicial review exists for "challenges to a consular officer's failure to make [a] decision." *Ahmed*, 2024 WL 22763, at *6.  Neither the Supreme Court nor the Second Circuit has addressed this question.

The Court finds the *Ahmed* court's approach persuasive.  The doctrine of consular nonreviewability is grounded in the principle that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control," *Munoz*, 602 U.S. at 907 (citation omitted), so Congress may "delegate to executive officials the discretionary authority to admit noncitizens immune from judicial inquiry or interference." *Munoz*, 602 U.S. at 907 (cleaned up).  Because the INA "does not

9

authorize judicial review of a consular officer's denial of a visa[,] the federal courts cannot review those decisions." *Id.* (cleaned up).

Allowing judicial review of allegedly unreasonable delays by consular officials does not run afoul of these concerns. The INA provides that "[a]ll nonimmigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(d). Since "the word 'shall' usually connotes a requirement" and "typically creates an obligation impervious to discretion," *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020), consular officers have a clear, non-discretionary duty to adjudicate nonimmigrant visa applications under Section 1202(d), *see Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) ("A consular office is required by law to act on visa applications."); *Yaghoubnezhad v. Stufft*, 734 F. Supp. 3d 87, 99 (D.D.C. 2024) ("[The Department of] State has a discrete, nondiscretionary to adjudicate visa applications."); *Khanom v. Kerry*, 37 F. Supp. 3d 567, 577 n.10 (E.D.N.Y. 2014) ("a consular official's duty to 'either issue or refuse' a visa application is nondiscretionary" (quoting 22 C.F.R. § 42.81)) (collecting cases); *Am. Acad. of Religion v. Chertoff*, 463 F. Supp. 2d 400, 421-22 (S.D.N.Y. 2006) ("[T]he wide latitude given the Executive to grant or deny a visa application—a discretion bounded only by the U.S. Constitution and Congressional mandate—does not include the authority to refuse to adjudicate a visa application. . . . [T]he Government has a nondiscretionary obligation to render a decision on every visa application.").

10

The Court thus concludes that "[j]udicial review of challenges to a consular officer's failure to make any decision at all does not interfere with the plenary power of Congress to prescribe the terms and conditions upon which aliens may come to this country," nor does it "call into question the enormous discretion that Congress has granted the Executive in this area." *Ahmed*, 2024 WL 22763, at *6 (cleaned up); *see also Sharifi v. Blinken*, 731 F. Supp. 3d 433, 438 (E.D.N.Y. 2024) ("For the Court to exercise its authority over undue delay cases under such circumstances does not interfere with Congress' plenary powers nor disturb the doctrine of consular nonreviewability."). To the contrary, it "simply ensure[s] that officers tasked by Congress to act . . . do so without unreasonable delay." *Id.* Otherwise, a Kafkaesque specter looms whereby "the Government could hold visa applications in abeyance for decades without providing any reasoned basis for doing so. Such an outcome defies logic—the Government simply does not possess unfettered discretion to relegate aliens to a state of 'limbo,' leaving them to languish there indefinitely." *Am. Acad. of Religion*, 463 F. Supp. 2d at 420 (cleaned up). Accordingly, the Court holds that the doctrine of consular nonreviewability does not apply to a challenge of unreasonable delay in adjudicating a visa application.

## B.    Administrative Procedures Act

The Court now turns to the merits of Plaintiff's unreasonable delay claim under the APA. The APA establishes a "basic presumption of judicial review for one suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16-17 (2020) (cleaned up); *see also* 5 U.S.C.

11

§ 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof").  Under the APA, an "agency shall proceed to conclude a matter presented to it" "within a reasonable time."  5 U.S.C. § 555(b).  When an agency action is "unlawfully withheld or unreasonably delayed," a reviewing court shall "compel" such action.  *Id.* § 706(1).

### 1.    Withheld Agency Action

As a threshold matter, Defendants argue that there is no "withheld" or "unreasonably delayed" action to compel because the agency has already taken the only discrete action it is legally required to perform.  *See* Mem. at 8 (quoting *Rashed v. Blinken*, No. 24-CV-00964 (PAE), 2024 WL 4904701, at *4 (S.D.N.Y. Nov. 27, 2024) ("the only agency action that can be compelled under the APA is action legally required" (cleaned up))).  Specifically, Defendants contend that the State Department fulfilled its duty to adjudicate Qazi's visa application under Section 1202(d) when the consular officer refused Qazi's visa application under Section 221(g) of the INA.  *Id.* at 8-9.  In response, Qazi counters that a refusal under Section 221(g) accompanied by further administrative processing does not constitute a completed adjudication.  *See* Opp'n at 12 (quoting *Giliana v. Blinken*, 596 F. Supp. 3d 13, 18 (D.D.C. 2022) ("when an application is still undergoing administrative processing, even where a refusal has been relayed, the decision is not final, and thus claims alleging unreasonable delay while a case remains suspended in administrative processing are not barred by the doctrine of consular

nonreviewability." (cleaned up))).

As codified, pursuant to Section 221(g) of the INA:

> No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law[.]

8 U.S.C. § 1201(g).

In this case, the consular officer determined after the consular interview that additional security screening was required before a visa could be granted. Peterson Decl., ¶ 5. But under the governing regulations, a consular officer "must" "issue," "refuse," or "discontinue" the visa after the consular interview. 22 C.F.R. § 41.121(a) ("When a visa application has been properly completed and executed in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa, or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa."). "[A] consular officer's decision after an application interview is a binary one—if a visa is not issued, it is by-definition refused." *Rashed*, 2024 WL 4904701, at *4 (cleaned up). Accordingly, Qazi's visa application was technically refused at that time. Peterson Decl., ¶ 5.

It is undisputed, however, that notwithstanding this nominal refusal, Qazi's visa application is still under consideration by the Consulate. For example, on

13

September 23, 2025, the Consulate emailed Qazi requesting additional documents. ECF No. 25-2.  Further, the Consulate has explicitly and repeatedly stated that Qazi's application is in "administrative processing, a normal part of the visa application process."  ECF No. 1-1 at 5-7.  The Consulate explained that "a decision on this case cannot be made until we finish our review," and it "cannot predict when the adjudication of this application will be completed."  *Id.*  Thus, far from having completed its process, the Consulate informed Qazi that "as soon as the processing of your application is complete and the outcome of your case is known, you will be contacted . . . ."  *Id.*

According to the Government, the fact that the Consulate has a routine practice of post-refusal administrative processing, "which may generate evidence or conclusions that would cause the officer to reconsider the refusal," does not negate that the agency has completed its adjudication of the petition as required by statute.  Mem. at 4.  Several courts in this Circuit agree with this position.  *See, e.g.*, *Esghai v. U.S. Dep't of State*, No. 24-CV-02993 (PAE), 2024 WL 4753799, at *4-5 (S.D.N.Y. Nov. 12, 2024) (holding that the "State Department . . . satisfied its duty to adjudicate [the plaintiff's] application under the INA" when "her application was refused under INA § 221(g)"); *Balali v. U.S. Embassy Yerevan*, No. 25-CV-00144 (SVN), 2026 WL 252399, at *5, *7 (D. Conn. Jan. 30, 2026) (describing the "consular officer's decision to 'refuse' [the plaintiff's visa] application and place it into

14

administrative processing" as a "final decision" and equating that decision with "adjudicating [the plaintiff's] application" (citation omitted)).

As discussed above, Section 1202(d) mandates that a consular officer "review[] and adjudicate[]" a nonimmigrant visa application.  8 U.S.C. § 1202(d). Neither Section 1202(d) nor the implementing regulations define the term "adjudicate."  *See* 8 U.S.C. §§ 1101, 1202(d); 22 C.F.R. pt. 41.  "Where Congress did not define certain terms . . . we presumptively give those terms their ordinary meaning," *United States v. Bulloch*, 165 F.4th 676, 683 (2d Cir. 2026) (cleaned up), as reflected in their dictionary definitions, *see, e.g.*, *Hall v. United States*, 566 U.S. 506, 511 (2012).  The definition of "adjudicate" is "to make an official decision about who is right in (a dispute)," "to settle judicially," Merriam-Webster Dictionary, https://perma.cc/KUL5-BWL3, or "[t]o settle, determine, or decide judicially, or by a similar legal or official process," Oxford English Dictionary, https://perma.cc/9TG3-J5JL.

The Consulate, by its own admission, has not yet rendered a final decision as to Qazi's visa application.  ECF No. 1-1 at 5-7.  Instead, the record reflects that a consular official preemptively and automatically refused Qazi's visa application following his consular interview because it lacked sufficient information to render a decision at that time, *then* continued to perform the statutorily-mandated review and adjudication of his visa application.  The fact that this process is embodied in regulations, 22 C.F.R. § 41.81, does not relieve the agency of its legal obligation under Section 1202(d), however.  *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S.

15

369, 392 (2024) ("Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference. Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says." (cleaned up)).

The Court thus holds that a visa refused pending further administrative processing is not an adjudication within the meaning of Section 1202(d). To hold otherwise would elevate form over substance and would permit the agency to flout its statutory obligation without consequence. *See, e.g.*, *Waris*, 2024 WL 3237914, at *5 ("[V]isas refused for administrated processing have not been finally adjudicated."); *Sharifi*, 731 F. Supp. 3d at 438 ("[I]n refusing [the plaintiff's] visa application for further administrative processing under Section 221(g), consular officials have taken no final action: though nominally 'refused,' [the plaintiff's] visa application remains under consideration in a state of administrative limbo that cannot fairly be described as a final determination."); *Saleh v. Tillerson*, 293 F. Supp. 3d 419, 431 (S.D.N.Y. 2018) ("[A] visa that is in 'administrative processing' cannot be said to have received final approval."); *Ibrahim v. U.S. Dep't of State*, No. 19-CV-00610 (BAH), 2020 WL 1703892, at *5 (D.D.C. Apr. 8, 2020) ("Decisions of both this Court and other courts have consistently recognized that where the application is still undergoing administrative processing, even where a refusal has been relayed, the decision is not final." (cleaned up)).

### 2.    Unreasonable Delay

The final question, then, is whether Plaintiff has established that the Consulate's delay in adjudicating his petition has been unreasonable. Courts evaluate unreasonable delay claims under the APA using a six-factor standard set forth in *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). *See Nat. Res. Def. Council, Inc. v. FDA*, 710 F.3d 71, 84 (2d Cir. 2013) (citing *TRAC* test for determining if agency action is unreasonably delayed); *see also Waris*, 2024 WL 3237914, at *5 (applying six-factor *TRAC* standard); *Ahmed*, 2024 WL 22763, at *6 (same). These six factors include:

(1)    the time agencies take to make decisions must be governed by a 'rule of reason,'

(2)    where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason,

(3)    delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake[,]

(4)    [t]he effect of expediting delayed action on agency activities of a higher or competing priority,

(5)    [t]he nature and extent of the interests prejudiced by delay, and

(6)    [a]ny impropriety lurking behind agency lassitude[.]

*TRAC*, 750 F.2d at 80 (cleaned up).

"Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances

17

before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003); *see also Kaur v. Mayorkas*, No. 22-CV-04514 (PAE), 2023 WL 4899083, at *5 n.6 (S.D.N.Y. Aug. 1, 2023) (describing *TRAC* analysis as "fact-intensive").  "What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case." *Saleh v. Ridge*, 367 F. Supp. 2d 508, 512 (S.D.N.Y. 2005) (quoting *Yu v. Brown*, 36 F. Supp. 2d 922, 935 (D.N.M. 1999)).

### a.    *TRAC* Factors One and Two

The first two *TRAC* factors, which are typically considered together, weigh in Qazi's favor.  **"**The first *TRAC* factor asks whether the agency had adopted a 'rule of reason' to govern its approach to adjudication." *Sheiner v. Mayorkas*, No. 21-CV-05272 (ER), 2023 WL 2691580, at *5 (S.D.N.Y. Mar. 29, 2023).  The Court therefore "inquir[es] into whether there is any rhyme or reason for the Government's delay," or "whether the agency's response time is governed by an identifiable rationale." *Id.* (cleaned up).  This is the "most important" factor. *Id.* ("Courts have characterized this factor as being the most important factor of the six." (cleaned up)); *Cohen v. Jaddou*, No. 21-CV-05025 (PAC), 2023 WL 2526105, at *3 (S.D.N.Y. Mar. 15, 2023); *see also In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008).  "Indeed, only the first TRAC factor is phrased as a categorical command; the time agencies take

18

to make decisions *must* be governed by a rule of reason." *Cohen*, 2023 WL 2526105, at *3 (citation omitted).

Although "Congress has not imposed a statutory deadline on considering visa applications," *Waris*, 2024 WL 3237914, at *6, the implementing regulations issued by the U.S. Department of State provide that "[c]onsular officers must ensure that the Form DS-160 . . . is properly and *promptly* processed in accordance with the applicable regulations and instructions." 22 C.F.R. § 41.106 (emphasis added). Beyond this regulatory directive to process petitions like Qazi's promptly, Defendants offer no explanation as to the Consulate's process for adjudicating visa petitions, its policies regarding relative prioritization of visa petitions, its average time frame for processing, its resource constraints, or the number of other visa petitions in its queue.[1] *See, e.g.*, *Aydemir v. Garland*, No. 22-CV-00100 (PAC), 2022 WL 4085846, at *4 (S.D.N.Y. Sept. 6, 2022) (recognizing that adopting a first-in, first-out methodology to deal with "a mountain" of pending applications constitutes a "rule of reason" within the meaning of the first *TRAC* factor). In other words, Defendants have not articulated any rule of reason that they follow when adjudicating H-1B visa applications in general, nor have they otherwise provided a rationale for the Consulate's delay regarding Qazi's application in particular.

---

[1] In response to a congressional inquiry into Qazi's case, the Consulate indicated that "[a]dministrative processing can last up to 90 days, but in some instances, it can take significantly longer." ECF No. 1-1 at 9; *accord* ECF No. 1-1 at 8 ("The consular post relayed that the application [is] pending the completion of administrative processing, which can last up to 90 days.").

Defendants instead urge the Court to look to caselaw to provide the relevant rule of reason for the Consulate's action, pointing to courts that have found processing delays between three to five years not unreasonable in cases involving immigration benefits.  Mem. at 16.

Yet the courts in each of these cases found a clearly articulated rule of reason to justify such a processing delay.  For example, in *Saleh*, the district court found a five-year delay in the process of adjudicating an application for adjustment of status to lawful permanent resident was not unreasonable "in light of the annual limit on the number of available adjustments and the volume of applications for adjustment in the system."  367 F. Supp. 2d at 513.  In *Aydemir*, the district court rejected a challenge to USCIS's 28-month delay in adjudicating an adjustment of status application in light of the agency's first-in, first-out methodology for processing those applications.  2022 WL 4085846, at *4.  And in *Cohen*, the district court found that USCIS's "visa availability" approach for EB-5 immigrant visa petitions, which prioritized processing for applicants from countries where visas were immediately available, constituted a "rule of reason" that reasonably explained the delay in processing time for the petitioner.  2023 WL 2526105 at *3-4.  The decision in *Xu v. Cissna*, 434 F. Supp. 3d 43 (S.D.N.Y. 2020), is similarly inapposite.  There, the court found that the delay in processing an asylum application was not caused by a lack of diligence on the part of the agency, but by USCIS's adoption of a last-in, first-out policy for scheduling interviews for asylum applicants designed to address a recent flood of applications that had overwhelmed the immigration system.  *Id.* at 53.

20

Accordingly, Defendants' reliance upon these precedents serves only to highlight their failure to put forward any explanation for the Consulate's delay in adjudicating Qazi's visa application.

Their argument also ignores the fact- and context-specific nature of the rule of reason requirement. Whether a delay is unreasonable "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee*, 336 F.3d at 1102.

Significantly, none of Defendants' cited decisions address processing delays for H1-B nonimmigrant visas at consulates. Rather, the cited caselaw concerns delays in processing applications for immigrant visas and status by USCIS, each of which turned on its facts.

Yet the H-1B visa program is wholly unlike applications to obtain immigrant status in the United States. As an initial matter, "the benefits of an immigrant visa—permanent residence—are distinct from those provided by a nonimmigrant visa—only temporary residence." *Kennedy v. United States Dep't of State*, No. 24-CV-11556-DJC, 2025 WL 662566, at *4 (D. Mass. Feb. 28, 2025). Thus, the "significance (and permanence) of the outcome" for these different types of visas is not comparable. *Id.* at *3.

In addition, an H-1B nonimmigrant visa is a time-limited benefit. Congress generally restricts authorized admission under H-1B status to six years. *See* 8

21

U.S.C. § 1184(g)(4).  The State Department's implementing regulations for this provision limit the initial duration of authorized admission for H-1B specialty workers to three years.  *See* 8 C.F.R. § 214.2(h)(9)(iii)(A)(1).  As such, a reasonable time frame for adjudicating an application for permanent resident status may not be analogous to what would be reasonable for adjudicating a nonimmigrant visa of limited duration.

On these facts, the Court finds that the Consulate has failed to establish that it followed a rule of reason with respect to the processing of Qazi's application.

### b.    *TRAC* Factors Three and Five

The third and fifth *TRAC* factors—which are "often considered together" and require examination of "the nature and extent of the interests prejudiced by delayed agency adjudication," *Saharia v. United States Citizenship & Immigr. Servs.*, No. 21-CV-03688 (NSR), 2022 WL 3141958, at *6 (S.D.N.Y. Aug. 5, 2022)—also weigh in Qazi's favor.  Facts concerning "substantial uncertainty about . . . employment, families, and futures" carry significant weight in favor of petitioners.  *Lyons v. United States Citizenship & Immigr. Servs.*, No. 21-CV-03661 (JGK), 2023 WL 144879, at *8 (S.D.N.Y. Jan. 10, 2023).

Here, the Consulate's seven-month delay has created substantial uncertainty for Qazi and significantly impacted his life.  Unable to report to his New York workplace, FHL placed Qazi on unpaid furlough in March 2026, Compl., ¶ 34, and is considering filling his position with another applicant, ECF No. 14.  As a result, Qazi has lost his income and has been forced to deplete his personal savings to meet

basic living expenses while abroad.  Compl., ¶ 34.  Qazi and his partner, who lives in the United States, have also been separated for the entirety of the delay, and their planned wedding date has come and gone.  *See id.*; *see also* Opp'n at 29 ("Petitioner has also been separated from his partner, a United States citizen, for over 255 days.").  Qazi has suffered other harms too, *see* Compl., ¶ 34, including the diminution of time available under H-1B status, which only lasts from October 1, 2025, through September 30, 2028, ECF No. 1-1 at 2.  Accordingly, considering these ongoing professional and personal harms, the third and fifth factors decisively favor Qazi.

      c.      ***TRAC* Factor Four**

The fourth *TRAC* factor—which concerns the effect of expediting the delayed action on other agency activities of a higher or competing priority—is neutral. Defendants argue that granting Qazi relief would simply move him to the front of the queue at the expense of other applicants.  Mem. at 20.  Defendants, however, fail to cite any evidence in support of this contention.  *See id.*  As discussed in the Court's analysis of *TRAC* factors one and two, they have put nothing in the record establishing any queue or processing backlog at the German Consulate, let alone evidence of the methodology by which the Consulate addresses those applicants, or where Plaintiff stands in that queue.  Absent such evidence, the Court cannot find that this factor weighs in their favor.  This is particularly true since the Consulate has represented that its administrative processing typically lasts 90 days while Qazi has been waiting three times as long.  *See* ECF No. 1-1 at 8-9.  If anything, the

scant record on this point suggests that most applicants who appeared for interviews after September 2, 2025, have already received decisions on their visa applications.

### d.    *TRAC* Factor Six

Finally, the sixth *TRAC* factor—which considers agency impropriety—is neutral, as Plaintiff does not allege that the Consulate has acted in bad faith. Compl., ¶ 40(f); *see also Maxhuni v. Mayorkas*, No. 23-CV-09076 (DEH), 2024 WL 3090165, at *4 (S.D.N.Y. June 20, 2024) ("[A]s to the sixth *TRAC* factor, Plaintiff does not allege any bad faith with respect to the delay in adjudicating his application, meaning it favors neither party.").

* * *

Accordingly, applying the *TRAC* factors, the Court finds that the Consulate's delay in adjudicating Qazi's H-1B visa application is unreasonable, and that he is entitled to relief under the APA.  The Court cautions that this holding should not be read to suggest that delays of mere months will ordinarily entitle an applicant for a nonimmigrant visa to relief under the APA.  The decision in this case is specific to the facts in this record, and in particular, to the Consulate's failure to proffer any explanation for the processing delay in this matter or make any effort to demonstrate due diligence.

## C.    Writ of Mandamus

The Mandamus Act provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or

24

employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. In order to make out a claim for unreasonable delay pursuant to the Mandamus Act, Qazi must show "(1) there is a clear right to the relief sought; (2) the Government has a plainly defined and peremptory duty to perform the act in question; and (3) there is no other adequate remedy available." *Benzman v. Whitman*, 523 F.3d 119, 133 (2d Cir. 2008); *accord Sharifi*, 731 F. Supp. 3d at 438 (E.D.N.Y. 2024). "The extraordinary remedy of mandamus under 28 U.S.C. § 1361 will issue only to compel the performance of a clear nondiscretionary duty." *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) (cleaned up).

The Court does not need to address the first two prongs of this test. Per the third prong, the availability of an APA claim leaves Plaintiff unable to establish that there is no other adequate remedy available. *Sharifi*, 731 F. Supp. 3d at 438; *see also Luo v. United States Citizenship & Immigr. Servs.*, No. 23-CV-01104 (HG), 2023 WL 5672041, at \*3 (E.D.N.Y. Sept. 1, 2023) (dismissing the plaintiff's mandamus claim because she may seek relief under the APA). Qazi's petition for a writ of mandamus is thus denied.

## CONCLUSION

Accordingly, the claims against Joseph D. Edlow, USCIS Director, and Todd Blanche, Acting U.S. Attorney General, are **DISMISSED**.

Defendants Marco Rubio, in his capacity as Secretary of the U.S. State Department, and Brian Heath, in his capacity as Consul General of the U.S. Consulate General in Frankfurt, are hereby **ORDERED** to complete the

administrative processing and adjudication of Plaintiff's visa application within 30 days from the date of this Order.

The Clerk of Court is directed to enter judgment consistent with this Opinion and Order, to close the case, and terminate all pending motions.

SO ORDERED.

Dated:  June 3, 2026
New York, New York

_____
JEANNETTE A. VARGAS
United States District Judge